**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JOHNNY DOWNS,
                           Plaintiff,

    v.                                                    No. 10-CV-203
                                                         (TJM/DRH)
CHERYL MEYERS, Nurse Practitioner -
NYCPC,
                           Defendant.

---

**APPEARANCES:**                                    **OF COUNSEL:**

JOHNNY DOWNS
Plaintiff Pro Se
Capital District Psychiatric Center
Clear View Center Inc.
320 New Scotland Avenue
Albany, New York 12208

HON. ERIC T. SCHNEIDERMAN           KRISTA A. ROCK, ESQ.
Attorney General for the                       Assistant Attorney General
   State of New York
Attorney for Defendant
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff pro se Johnny Downs ("Downs"), formerly an inmate in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Cheryl Meyers ("Meyers"), a nurse employed by the Capital District Psychiatric Center, violated his constitutional rights under the Eighth and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Meyers' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 41. Downs opposes the motion. Dkt. No. 42. For the following reasons, it is recommended that Meyers' motion for summary judgment be granted.

## I. Background

Downs is a diabetic requiring daily insulin treatment. Compl. at 7; Downs Dep. (Dkt. No. 41-8) at 10, 12. On June 30, 2009, Downs was admitted for observation at Clinton Correctional Facility's Mental Health Unit because he was moody, irritable, argumentative, and communicating delusional beliefs that he was a member of the FBI and that because the correctional staff were experimenting with his medication, he was refusing to take his insulin. Meyers Aff. (Dkt. No. 41-4) ¶¶ 5-8; Dkt. No. 41-5 at 1; Downs Dep. at 14. The medical staff from Clinton certified that Downs was at risk of harming himself and required involuntary hospitalization at the Central New York Psychiatric Center ("CNYPC"). Dkt. No. 41-5 at 1, 88-92; Meyers Aff. ¶ 9. On July 16, 2009, Downs was transferred from Clinton and admitted to CNYPC where he was ultimately diagnosed with Paranoid Schizophrenia.[2] Meyers Aff. ¶ 10; Dkt. No. 41-5 at 9-10.

Defendant Meyers, a nurse practitioner, worked at CNYPC and began treating Downs on July 20, 2009. Dkt. No. 41-5 at 15-16, 19-20. During their first meeting, Downs told Meyers that he did not belong in the hospital, he had no mental illness, he did not require psychiatric medication, and this was "all part of a conspiracy against him by the FBI and

---

[2] "Symptoms of paranoid schizophrenia may include a preoccupation with one or more delusions, and/or auditory hallucinations. In this type of schizophrenia, individuals also frequently suffer from feelings of being persecuted or plotted against" Meyers Aff. ¶¶ 12-13.

2

corrections." Dkt. No. 41-5 at 15; see also Downs Dep. at 12, 33-34 (denying that he currently, or has ever, suffered from a mental illness). Meyers classified his behavior as delusional and bizarre. Dkt. No. 41-5 at 15. Throughout the next five months, Meyers saw Downs on at least five occasions. Dkt. No. 41-5 at 28-29, 32-33, 48-49, 50-51, 62-63. Throughout, Downs continued to assert that he was not mentally ill and required no medication, had suspicious and paranoid thoughts and delusions, and remained aggressive, uncooperative, and challenging. Id.;[3] see also Downs Dep. at 18-19, 24, 41-42 (explaining how during his hospitalization at CNYPC and, even after returning to Clinton, his mind had been infiltrated by computers which would "promote" violence, listen to his and other inmates thoughts, and turn them all into dummies)

On August 3, 2009, a petition for an order committing Downs to remain in CNYPC for an additional six months was filed. Meyers Aff. ¶ 17; see also Dkt. No. 41-5 at 84 (examining doctors' recommendations that Downs remain hospitalized). Downs objected to the petition and a subsequent hearing was held on August 25, 2009 at which it was determined that commitment was still appropriate. Meyers Aff. ¶¶ 18-19; Dkt. No. 41-5 at 82.

On September 13, 2009, Downs was involved in an altercation with another patient resulting in a emergency team being deployed to handle the situation. Meyers Aff. ¶ 20; Downs Dep. at 20 (explaining that he was involved in an altercation caused by the control the computers had "promoting violence over [Downs'] head."); Dkt. No. 41-5 at 41-46.

---

[3] During Downs' hospitalization, he was treated by a number of other mental health professionals who made identical observations and conclusions in their progress notes that Downs had paranoid thoughts, was aggressive and delusional, did not feel he was suffering from a mental health ailment, and refused to agree to the administration of psychotropic medication. See generally Dkt. No. 41-5 at 2-81 (mental health records).

3

Despite staff intervention, Downs refused to stop fighting and was placed in restraints. Meyers Aff. ¶ 21; Dkt. No. 41-5 at 41-46.  When Downs refused to take oral medication, he received shots in his left and right legs to alleviate his agitation.  Meyers Aff. ¶ 22; Dkt. No. 41-5 at 46.  The restraint and medication orders were given by a doctor who is not a party to the present suit.  Meyers Aff. ¶ 25; Downs Dep. at 21-22 (stating that an "Indian" doctor ordered for a nurse, who was not defendant Meyers, to administer the shots to Downs). Meyers was neither present nor involved in the decisions to restrain or medicate Downs. Meyers Aff. ¶ 24; Downs Dep. at 22 (confirming that Meyers was not in the room when the medication was administered).

On October 28, 2009, Downs was involved in another altercation with another patient, again resulting in an emergency team being deployed.  Meyers Aff. ¶¶ 27-28; Downs Dep. at 25; Dkt. No. 41-5 at 53-59.  After the assault, Downs remained agitated and refused to take oral medication, so a second doctor, also not a party to the present action, ordered that Downs be restrained and receive injections of medication to pacify him.  Meyers Aff. ¶ 29; Dkt. No. 41-5 at 53-54.  The injections were administered by a nurse who is also not a party to the suit.  Meyers Aff. ¶ 30.  Meyers was again neither present for nor involved in the decisions to restrain or medicate Downs.  Meyers Aff. ¶ 32; Downs Dep. at 27-28.  These two instances represented the only times where Downs was given psychotropic medication. Meyers Aff. ¶ 41; Dkt. No. 41-5 at 70-71.  Downs disagreed with the forced medication that he was given on these two occasions.  Downs Dep. at 30.

Downs had an initial parole release date of November 10, 2009.  Dkt. No. 41-5 at 60. However, Downs' conditional release date was on March 27, 2011.  Downs Dep. at 7.  The parole release date was extended for another eleven months, presumably given Downs'

4

mental health conditions, because parole reserves the right to continue to hold patients in custody for treatment. Dkt. No. 41-5 at 60. Downs alleged that he never received a decision about the parole extension, so the parole officer indicated that he would send a second copy of the paperwork to Downs. Id.

On December 2, 2009, the Executive Director of CNYPC petitioned to have Downs involuntarily medicated, to which Downs objected. Meyers Aff. ¶¶ 34-37; see also Dkt. No. 41-5 at 94-95. Meyers submitted a supporting affidavit with the petition, concluding that "Downs was not competent to make reasoned decisions concerning his treatment, and . . . that it would be in Downs' best interest to be treated [with psychiatric medication] . . . ." Meyers Aff. ¶ 36; Dkt. No. 41-5 at 99-105. A hearing was conducted on December 15, 2009, where Meyers testified in support of the petition. Meyers Aff. ¶ 38; Dkt No. 41-6 at 6-37 (transcript of testimony outlining Meyer's diagnosis of Downs' paranoid schizophrenia based upon his delusional and paranoid beliefs that the FBI was monitoring him and he was being used for experimentation, her recommendations for involuntary medication, and her proposed treatment plan). The petition was denied as the court held that there was a lack of clear and convincing evidence establishing "that Downs lacked capacity to make a reasoned decision regarding his own treatment." Meyers Aff. ¶ 39; Dkt. No. 41-5 at 122-23. Therefore, the medication with which Meyers proposed to treat Downs was never administered to him. Meyers Aff. ¶ 43. Downs was discharged from CNYPC and returned to Clinton on December 30, 2009. Meyers Aff. ¶ 40; Dkt. No. 41-5 at 73-81. This action followed.

## II.  Discussion

Downs claims that his Eighth Amendment rights were violated (1) on the two occasions where he was restrained and involuntarily treated with psychotropic medication; (2) by Meyer's alleged false statements in her petition supporting Downs' involuntary medication and related testimony; and (3) by Meyers incorrect diagnosis that Downs was suffering from a mental health ailment.  Additionally, liberally construing Downs' complaint, he claims that his Fourteenth Amendment rights were violated when he was involuntarily committed to CNYPC and when his parole release date was extended based upon that hospitalization. Defendant argues for dismissal because (1) the Eleventh Amendment bars suit against individuals sued in their official capacities; (2) Downs' challenges to his hospitalization at CNYPC are barred and meritless; (3) Meyers' alleged false statements fail to state a claim; (4) Downs' has failed to establish Meyer's personal involvement; (5) the Eighth Amendment claims regarding Downs' diagnosis are meritless; and (6) Meyers' is entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

### B.  Eleventh Amendment

It is unclear from the complaint whether Downs sues Meyers in both her individual and official capacities.  The Eleventh Amendment provides that "[t]he Judicial power of the

United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Here, Downs seeks monetary damages against Meyers in her official capacity for acts occurring within the scope of her duties within CNYPC. By bringing suit against CNYPC, Downs in actuality brings suit against DOCCS and thus the state. Therefore, the Eleventh Amendment bar applies and serves to prohibit Downs' claim for monetary damages against Meyers in her official capacities.

Accordingly, it is recommended that Myers' motion be granted on this ground and that

judgment be granted to Meyers as to Downs' claim against her in her official capacity.

### C. Confinement at CNYPC

Downs asserts that he never should have been placed in CNYPC. Meyers contends that Downs' claims are barred by both the favorable termination rule and the Rooker-Feldman doctrine.

### 1. Heck v. Humphrey[4]

A federal court has jurisdiction to consider an "application for a writ of habeas corpus in behalf of a person in custody . . . [where such] custody [is] in violation of the Constitution . . . of the United States." 28 U.S.C. § 2254(a). An individual seeking release from involuntary confinement in a mental institution is "in custody" and, thus, habeas relief is available and appropriate for such situations. See Duncan v. Walker, 533 U.S. 167, 176 (2001) (explaining that a habeas petition may be available to individuals in custody pursuant to civil commitment); Huftile v. Miccio-Fonseca, 410 F.3d 1136, 1139 (9th Cir. 2005) ("It is well established that detainees under an involuntary commitment scheme . . . may use a § 2254 habeas petition to challenge a term of confinement."); Buthy v. Comm. of Office of Mental Health of New York State, 818 F.2d 1046, 1051-51 (2d Cir. 1987) (holding that habeas corpus was the correct vehicle within which to dispute involuntary commitment) (citations

---

[4] The fact that Downs was released after filing the complaint and is no longer incarcerated is of no consequence because the "favorable termination requirement applies to plaintiffs who are incarcerated at the time that they file their Section 1983 actions, regardless of whether they are later released." Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 n.6 (S.D.N.Y. May 5, 2009) (citations omitted) (Dkt. No. 41-2).

9

omitted); Souder v. McGuire, 516 F.2d 820, 823 (3d Cir. 1975) ("There is no question about the appropriateness of habeas corpus as a method of challenging involuntary commitment to a mental institution.") (citations omitted); Sarzen v. Gaughan, 489 F.2d 1076, 1081-82 (1st Cir. 1973) (discussing procedural course of involuntary commitment case which utilized a habeas petition to challenge the commitment); Richard S. v. Carpinello, 628 F. Supp. 2d 286, 291 (N.D.N.Y. 2008) (arguing that commitment was improper is successfully achieved through a habeas corpus petition). There is little difference between the constraints on personal liberty in the case of criminal confinement and that in civil commitment as both compel an individual to debilitating and isolated living conditions, which, if imposed unconstitutionally, are extremely offensive to notions of justice, fundamental fairness, and the right to be free from restraint. See Peyton v. Rowe, 391 U.S. 54, 66 (1968) (explaining that the habeas writ is "not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose – the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty.").

However, when available, habeas is the sole possible remedy, excluding all other forms of relief that "would necessarily imply the invalidity of his conviction or sentence," unless a plaintiff proves that the conviction or sentence has been reversed on direct appeal or declared invalid. Heck v. Humphrey, 512 U.S. at 477, 480-81, 486-87 (1994). Such preclusion applies to procedural challenges, where the nature of the challenge would necessarily imply the invalidity of the underlying confinement. Edwards v. Balisok, 520 U.S. 641, 646-649 (1997). Downs challenges the procedures and conclusions of the state court which resulted in his involuntary retention at CNYPC.

Accordingly, the favorable termination rule precludes the current claim unless there has

been a reversal or declaration of invalidity. The record contains neither. Therefore, Myers' motion on this ground as to this claim should be granted.

### 2. Rooker-Feldman Doctrine

The Rooker-Feldman doctrine arises from decisions by the Supreme Court in District of Columbia Ct. of Appeals v. Feldman, 460 U.S. 462 (1983), and Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and provides that "inferior federal courts have no subject matter jurisdiction over suits that seek direct review of judgments of state courts, or that seek to resolve issues that are 'inextricably intertwined' with earlier state court determinations." Vargas v. City of New York, 377 F.3d 200, 205 (2d Cir.2004). As the Supreme Court has recently noted, however, the doctrine

> is confined to ... cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. [The doctrine] does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.

Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 125 S.Ct. 1517, 1521 (2005). The Second Circuit has defined four elements which are required prior to applying the Rooker-Feldman doctrine:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must 'complain[ ] of injuries caused by [a] state-court judgment[.]' Third, the plaintiff must 'invit[e] district court review and rejection of [that] judgment[ ].' Fourth, the state-court judgment must have been 'rendered before the district court proceedings commenced.'

Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005).

11

Here, all four elements are clearly satisfied.  First, Downs lost in New York Supreme court action which resulted in his detention in CNYPC in the Fall of 2009.  The second and third elements are demonstrated by Downs' complaint addressing the harms he has suffered from these court determinations and his challenges to the correctness of those rulings.  Lastly, the state court decision at issue, was rendered six months prior to the commencement of the instant action.

Accordingly, Myers' motion should be granted on this ground and Downs' claims regarding the appropriateness of his confinement at CNYPC are barred by the Rooker-Feldman doctrine.

### 3. Due Process[5]

To the extent that Downs has claimed a Fourteenth Amendment violation and the previous preclusions do not apply, such claims are still meritless.

> The Supreme Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protections[; however, p]etitioning for a writ of habeas corpus, after fully exhausting state court remedies, is the appropriate method for an individual to challenge the fact or duration of his involuntary civil commitment to a psychiatric institution.

Hunter v. Gipson, 534 F. Supp. 2d 395, 398 (W.D.N.Y. 2008) (citations and internal

---

[5] The fact that Downs' parole release date was extended eleven months based upon his hospitalization is of no consequence.  Such claims are meritless because inmates have no constitutionally protected interest in parole, or other conditional release from prison, prior to the expiration of a valid sentence.  Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 7 (1979).  Therefore, extending the parole release date within the term of the inmate's sentence does not give rise to a constitutional violation.

quotation marks omitted). Accordingly, any claims regarding the due process provided during a civil commitment hearing should be argued through a habeas petition.

Even if asserting such claims was appropriate in a § 1983 action, such claims would still fail. As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001). "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting." Malik v. Tanner, 697 F. Supp 1294, 1301 (S.D.N.Y. 1988) (citing Wolff v. McDonnell, 418 U.S. 539, 556 (1974)). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." Fisk v. Letterman, 401 F. Supp. 2d 362, 374 (S.D.N.Y. 2005) (citing Addington v. Texas, 441 U.S. 418, 425 (1979)). However, the Supreme Court has "permitt[ed] involuntary confinement based upon a determination that the person currently both suffers from a 'mental abnormality' or 'personality disorder' and is likely to pose a future danger to the public." Kansas v. Hendricks, 521 U.S. 346, 371 (1997).

The law under which Downs was committed, New York Corrections Law § 402, parallels the procedural safeguards outlined in the Mental Hygiene Law which "ha[ve] withstood challenges that it was facially unconstitutional." United States v. Walters, 23 F.3d 29, 32 (2d Cir. 1994) (citations omitted). In this case, nothing supports an inference that the procedures by which Downs was retained were carried out in the appropriate manner. Downs was examined by physicians who provided affidavits indicating that he was a danger to himself and upon this petition his hospitalization was approved and renewed. Downs does not allege that he failed to receive notification of the proceedings or that the necessary

medical screenings were not completed.

Accordingly, to the extent that a procedural due process claim remains, such a claim is meritless as Downs received all the process to which he was entitled. Therefore, Myers' motion on this ground should be granted.

### D. Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation,
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

14

323-24 (2d Cir. 1986)).[6]

Downs contends that he was forcefully, involuntarily medicated against his wishes on the two occasions when he received shots in his legs after being involved in altercations with other residents. The record demonstrates that the only two occasions when Downs received psychotropic medications was on these two altercations. Additionally, the record demonstrates, and Downs concedes, that Meyers was neither present nor involved in the decision-making process authorizing the administration of those shots. Moreover, the record shows that the individuals responsible for ordering and administering the shots were doctors and nurses who were not named as parties to the present action. Therefore, despite Downs' allegations to the contrary, Meyers was neither directly nor indirectly involved in the decision to provide or administer the psychotropic medications.

Accordingly, Myers' motion should be granted on this ground as Downs has failed to establish Meyers' personal involvement with the incidents of forced medication.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care.

---

[6] Various courts in the Second Circuit have discussed how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monore County, 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need.  Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66.  More than negligence is required "but less than conduct undertaken for the very purpose of causing harm."  Hathaway, 37 F.3d at 66.  The test for a § 1983 claim is twofold.  First, the prisoner must show that there was a sufficiently serious medical need.  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer v. Brennan, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d at 702).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

16

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104, (1976).

> Thus, disagreements over medications, diagnostic techniques (e.g., the need for x-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence, amounting to medical malpractice, but not the Eighth Amendment.

Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) (citing Estelle, 429 U.S. at 107); see also Chance, 143 F.3d at 703 (holding that "[m]ere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

Downs continually contends that Myers improperly diagnosed him with paranoid schizophreniaand other mental illness, and that her affidavit and testimony indicating that he was mentally ill was false.[7] Downs disagreed with Myers diagnosis and proposed treatment for his illness. First, his conclusory allegations that he was not mentally ill are contradicted

---

[7] Downs alleges that Myers made false statements during her testimony in state court regarding his mental health condition. Even if Myers did make false statements, that alone is insufficient to sustain a constitutional claim. The fact that state employees call an inmate "'paranoid' and that [he or she] refer[s] him for a mental health evaluation may be forms of harassment, but they are not serious enough to implicate the Constitution." Mateo v. Fischer, 682 F. Supp. 2d 423, 432 (S.D.N.Y. 2010). Accordingly, to the extent that such claims are advanced, they are meritless.

by the medical record as a whole, as Downs received treatment and counseling from a number of individuals who all made observations and conclusions which were identical to those made by Myers. Additionally, disagreements over diagnosis and proposed treatment do not constitute deliberate indifference. Sonds, 151 F. Supp. 2d at 312, Chance, 143 F.3d at 703. Furthermore, even if Myers was negligent in diagnosing Downs' condition, negligence alone is insufficient to allege an Eighth Amendment claim. Hathaway v. Coughlin, 99 F.3d at 553.

Accordingly, Myers' motion on this ground should be granted.

### F. Qualified Immunity

Finally, Myers claims that even if Downs' constitutional claims are substantiated, she is entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken, 236 F. Supp. 2d at 229-30. However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified or good faith immunity might still be available as a bar to a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there

is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached concerning Downs' claims because, for the reasons discussed above, Downs has failed to raise a question of fact as to the first prong of the inquiry

Accordingly, in the alternative, Myers' motion should be granted on this ground.

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Myers' motion for summary judgment (Dkt. No. 41) be **GRANTED** and that judgment be entered for Myers on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 17, 2012
       Albany, New York

_David R. Homer_
United States Magistrate Judge